JOHN W. HUBER, United States Attorney (#7226)
RUTH HACKFORD-PEER, Assistant United States Attorney (#15049)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JOHN ANTHONY TAYLOR, Defendant. | Case No. 2:20mj333 DMW <br><br> FELONY COMPLAINT <br><br> Count 1: 18 U.S.C. § 1343 (Wire Fraud) <br><br> Chief Magistrate Judge Paul M. Warner <br><br> SEALED |

Before the Honorable Paul M. Warner, United States Chief Magistrate Court Judge for the District of Utah, appeared the undersigned, who on oath deposes and says:

### Count 1
### 18 U.S.C. § 1343
### (Wire Fraud)

1. All the allegations set forth in this Complaint are incorporated herein by reference and realleged as though fully set forth herein.

2. On or about April 23, 2020, in the Central Division of the District of Utah, and elsewhere,

1

## JOHN ANTHONY TAYLOR,

defendant herein, for the purpose of executing and in furtherance of a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and omissions of material facts, and attempting to do so, sent an email in interstate commerce from his email account (anthony@wasatchpromotionalproducts.com) to his intended victim containing a fake purchase order of N95 Health Care Particulate Respirator and Surgical Masks;

All in violation of 18 U.S.C. § 1343.

This complaint is made on the basis of investigation consisting of the following:

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, Special Agent Joseph T. Oppedisano, being duly sworn, depose and state as follows:

**Brief Summary**

1. On April 1, 2020, the Federal Bureau Investigation ("FBI") of Houston, Texas was contacted, through counsel, by a United States based medical company ("Company 1"). Company 1 was concerned about Damon Archibald and his company, National Sales Force, purporting to have access to one billion 3M N95 respirators. At that time, publicly available information indicated the global production numbers of N95 was well below a billion respirators per month.

2. Thereafter, an FBI undercover employee ("UCE") contacted Archibald telephonically about purchasing large quantities of N95 masks. Archibald told the UCE he had multiple supply lines of N95 masks and was able to acquire large quantities for the UCE. Archibald also introduced the UCE to James Pesoli, a Chicago-based attorney. Pesoli requested bridge loans from the UCE to help fund medical purchases.

3. Archibald claimed to have access to a large shipment of 3M 1860 N95 respirators ("1860s") which were being delivered to Angleton, Texas. However, that deal fell through and Archibald then introduced UCE to Anthony Taylor of Positive Marketing and Wasatch Promotional Products. Archibald and Taylor purported to broker a deal for 3 million 1860s at the price of $5.49 per respirator. Archibald and Taylor requested UCE execute an agreement for this purchase using Escrow.com. Company representatives of 3M confirmed that there was no relationship with 3M and Archibald and/or Taylor.

3

## INTRODUCTION AND AGENT BACKGROUND

4. I am a Special Agent of the FBI and a Federal law enforcement officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure. I have been employed with the FBI since 2019.

5. I investigate crimes involving Corporate, Securities, and Commodities Fraud, as well as general mail and wire fraud. I have training in the preparation and service of criminal arrest and search warrants, and I have been involved in the investigation of offenses including mail and wire fraud.

6. The statements in this affidavit are based on my personal observations, training and experience, information obtained from witnesses and other law enforcement officials, and a review of records obtained during the course of the investigation. Because this affidavit is being submitted for the limited purpose of a complaint, I have not included each and every fact known to me concerning this investigation

## APPLICABLE STATUTES

7. Title 18, United States Code, Section 1343, reads, in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

## FACTS SUPPORTING PROBABLE CAUSE

8. On April 1, 2020, the FBI received a telephonic complaint from counsel for Company 1. On or about March 31, 2020, Company 1 was contacted by Chad Walker, who

4

purported to have access to large amounts of 3M N95 respirators and other personal protective equipment (PPE). A conference call between Walker, Archibald, and representatives of Company 1 took place on or about March 31, 2020. During the conference call, Archibald purported to have access to 1 billion 3M N95 respirators which would be in Houston, Texas on April 2, 2020. Walker and Archibald attempted to sell these respirator masks to Company 1; however, Company 1 did not believe the representations made by Walker and Archibald and did not consummate a purchase.

9. On April 9, 2020, UCE contacted Archibald inquiring about purchasing N95 masks. UCE purported to be in financing and had money to front for the purchase of PPE.

10. On April 17, 2020, Archibald spoke with the UCE about options to purchase masks. Archibald asked the UCE if he/she was interested in 3M 1860 N95 respirators ("1860s"), to which the UCE stated yes. Archibald stated that he could get 3 million 1860s for $5.49 per respirator, but the UCE would have to put up his/her own money into a third-party escrow. Archibald explained that once UCE put in a purchase order and put money into the third-party escrow UCE would receive "proof of life", "SKU number" and "lot number." Archibald explained that the escrow was at a Wells Fargo bank and it was a "blind" escrow.

11. Archibald told the UCE the third-party company was "Positive Marketing" in Utah and the person the UCE will deal with was Taylor. UCE asked Archibald for more information about Taylor's company because it did not appear to be a PPE company. Archibald stated to the UCE that the UCE was looking at the wrong website that he/she should look at "Wasatchpromotionalproducts.com" for the PPE.

5

12. Still on April 17, 2020, Archibald contacted the UCE and introduced the UCE to Taylor telephonically. Taylor stated he had recently started to focus on masks through his business. Taylor stated he had contracts for "a million, 30 million, 60 million for a couple different state governments" for KN95 masks. Taylor stated he had done several shipments of 3M 8210 respirators ("8210s"). When pressed by the UCE who Taylor's direct connection to 3M was with, Taylor avoided answering the question. However, Archibald stated asking about the relationships with 3M was "taboo" in the industry because "of NDAs and non-circumvents and things like that." During the conference call, Archibald reassured the UCE that the deal was no risk and if the UCE didn't "like the way that the guys that deliver your masks and you don't like the way he combs his hair, you can say 'I don't want the order.'"

13. On April 18, 2020, Archibald sent through text message a web link to "escrow.com" for the UCE to review. The link was for an escrow agreement, transaction ID 8034805, for the sale of three million 1860s for the total price of $16,470,250. The contract was between Positve Marketeing [sic] LLC and the UCE's email (Taylor later acknowledged having sent the escrow agreement to the wrong email adding an "s" to the end of the UCE's email address).

14. The same day, Archibald reassured UCE over doubts UCE expressed about Taylor. Archibald explained Taylor had an order of "80 million, 100 million, 60 million" 1860s from previous customers of Taylor. Archibald stated in the past 24 hours, 3M started requiring "30% down" to make a purchase from 3M. Archibald said it would not be a problem because the 1860s could be resold. To reassure the UCE, Archibald stated, "the thing that you have, you have no idea how good it is. There's people out there doing this stuff, I'm tellin' you, I'm

promising you on everything, you have a more solid umm... resource than anyone that you know. Your source is so solid. So ummm I have six sources to 3M, this, this might be the most solid of them all." Archibald also stated he had two other people that were placing orders with Taylor.

15. On April 20, 2020, UCE explained to Archibald after review of the escrow.com agreement, the UCE noticed that the entire balance would have to be paid prior to shipping, going against what Archibald previously stated. The UCE explained through text message to Archibald that he/she would like to see documentation that Taylor could provide the respirators. Archibald through text message wanted to know if the UCE has established the escrow account, the UCE replied, the UCE needed more assurance and/or some documentation.

16. On April 22, 2020, Archibald through text message asked the UCE to "call me ASAP, unreal news." In a phone call, Archibald stated Taylor sent an email 3M had accepted the UCE's 3 million order, verbally. Archibald explained to the UCE that if he/she verbally committed to the transaction, he/she would be receiving his "lot number" and "customer number" from 3M and the UCE would be able to look up his shipment right on the 3M website. Archibald stated that this information was coming from Taylor and that this "100%" confirms Taylor's relationship with 3M. Archibald then conferenced in Taylor on a telephone call.

17. Taylor stated that he was expecting to get approval from 3M for the UCE's deal, including "certificates", a "lot number" and a "customer number." Taylor explained to all parties that the certificates are proof that 3M can manufacture the product. Taylor explained that once the "lot number" comes in the UCE will be able to enter the information on 3M's website to see where the order is at in the process. Taylor explained that the "lot number" can also show "proof of life" to prove that the order is the UCE's. Taylor explained that the UCE

can request a proof of life video saying "this product is for UCE and that they will go ahead and do a video of your product, open up some of the boxes to show the product, have a paper saying whatever you ask them to say to prove that its live." Archibald stated to Taylor that he did not know that 3M did "proof of life" videos. Taylor stated and confirmed that 3M does provide the video if requested. Taylor stated to the UCE that he should get "verified" on the escrow system.

18.    On April 23, 2020, Taylor, utilizing email anthony@wasatchpromotionalproducts.com, sent UCE an email which stated, "I have been in phone calls this morning and so far I understand all orders have been approved. I am awaiting certifications and order rundown/location schedules to verify all for you. I am attaching part of the correspondence – of course redacted info. Escrow requirements may also change slightly, but will confirm all with verifications. I appreciate your patience – it is a process with this production vs other methods. I will update just as soon as I have more information." The email was signed by Anthony Taylor. The attachment was as follows:

*[Image of faded/scanned document excerpt containing purchase order details for 3M Health Care Particulate Respirator and Surgical Mask, 3M Product Number 1860, 3M ID 70070612864, NIOSH Approved N95, FDA Approved for use as surgical mask, Helps protect against certain airborne biological particles, Fluid resistant and disposable, SKU: 70070612864 UPC: 50707387432429.]*

The quantities and delivery locations will be as per the highlighted:

| Item | Quantity | Location | Price |
|------|----------|----------|-------|
| 3M 1860 | 3,000,000 | Houston, TX | |
| 3M 1860 | 1,500,000 | Park City, UT | |
| 3M 1860 | 1,500,000 | Los Angeles, CA | |
| 3M 1860 | 5,000,000 | Salt Lake City, UT | |
| 3M 1860 | 13,000,000 | Los Angeles, CA | |
| 3M 1860 | 10,975,000 | Florida | |
| 3M 1860 | 54,000,000 | JFK, NY | |
| 3M 1860 | 100,000,000 | UAE or Dubai | |
| 3M 1860 | 100,000,000 | Mexico City, MX | |
| 3M 1860 | 400,000,000 | Abu Dhabi, UAE | |

The following transaction process is agreed:

1. Seller acknowledges this PO in writing
2. Buyer [redacted] is introduced to authorized distributor
3. Seller confirms availability of merchandise, including delivery to Buyer
4. Seller to provide all 3M authenticity certificates, authorization and proof of production from the order
5. Escrow agreement signed between Buyer and Seller, Escrow Agent and Payment Services Provider
6. Certification is issued by SGS and Seller provides
7. Seller ships merchandise to Buyer and submits to Buyer's custody (CIF)
8. Escrow funds released for 100% of the purchase

All buyers have shown us POF and will put money in AP

19. On the same day, Archibald sent a picture text message to UCE. UCE was unable to receive the picture text message, but Archibald stated it was "the same thing that Anthony sent you." Archibald stated, "it's legit."

20. On April 28, 2020, UCE sent an email to Archibald and Taylor utilizing emails, anthony@wasatchpromotionalproducts.com and damon@nationalsalesforce.org inquiring as to the status of the order. UCE asked if the order could still proceed if it was sent to hospital/medical or a government delivery. Taylor responded on the same day and said, "some processes changed yesterday. And we will need to restructure all of our deals asap for 3m SOP as per below --" The email went on to give information on different options with ordering the

9

1860s and 8210s. The email contained an attachment which purported appeared to be a 3M order confirmation dated April 17, 2020.

21. Following the April 28, 2020 email, on the same day, Archibald, Taylor, and UCE had a three-way telephone call. Taylor stated the order for three million 1860s could still go through, but if the 1860s were to be purchased, it had to be sent to "medical or government." Taylor stated he would restructure a deal with the UCE so the UCE would pay 3M directly for the product and then also pay Taylor through the escrow. Taylor stated, "we just have to structure the whole thing differently and keep it above board so 3M issues are not an issue as far as the DOJ and what they're looking at on costs and how those deals are structured." UCE represented he/she could find a medical company that could do UCE a favor to receive the 1860 order. Taylor stated he would draft up a revised escrow agreement for UCE. Taylor also stated the attachment from the email earlier in the day was from an order for one of Taylor's previous customers.

22. Shortly after the phone conversation, on the same day, UCE received an email from escrow.com stating there was a new escrow agreement waiting for the UCE. The agreement, transaction ID 8255769, was between Positive Marketeing [sic] LLC and the UCE for $2,916,922.80. No specifics on the product purchased were included other that a reference to "goods."

23. Also on April 28, 2020, UCE received an email from DocuSign to review a marketing consulting agreement between UCE and Positive Marketing, LLC, with Taylor being the signatory for Positive Marketing, LLC. The agreement was for the UCE to pay Positive

10

Marketing, LLC a 44% commission on the net sale price of PPE sales where Positive Marketing, LLC would facilitate the introduction of the UCE to suppliers of PPE.

24. Following that email, again on April 28, 2020, Taylor emailed UCE, with a carbon copy to Archibald. The email read in part, "I have emailed docusign consulting agreement as well as established new escrow #8255769. Once escrow has been established for the consulting agreement, we will establish your contract with 3m distributor directly for the direct product delivery. Once we have procured your order through 3m channel and delivery, the escrow agreement will be complete. Any questions, let me know. Let's move forward as soon as possible.." (errors in the original). This email was followed up with another email from Taylor stating, "You would pay 3M directly roughly 7 million depending on which mask you choose.. So in total you would save approximately 6 million [three money smiley face emjois]".

25. On April 17, 2020, a representative for the 3M corporation confirmed they had no relationship with Archibald. 3M did note a person with Archibald's name had contacted 3M on April 10, 2020, inquiring about where to buy 3M respirators.

26. On April 24, 2020, a representative for the 3M corporation confirmed they had no record of Taylor, Positive Marketing (in Utah), or Wasatch Promotional Products as having a relationship with 3M. 3M also stated they were not aware of any order for 1860s which matched the order purported placed by Taylor described in the April 23, email from Taylor.

## CONCLUSION

Based on the information set forth above, I submit that there is probable cause to believe the Subjects listed above have conspired to violate 18 USC section 1343.

*/s/ Joseph Oppedisano*
Affiant, Joseph Oppedisano
Special Agent, FBI

SUBSCRIBED AND SWORN to before me this 29 day of April, 2020

Paul M. Warner
United States Chief Magistrate Court Judge

APPROVED:

JOHN W. HUBER
United States Attorney

*/s/ Ruth Hackford-Peer*
RUTH HACKFORD-PEER
Assistant United States Attorney

12